UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
KATHRYN FERRIS STERGUE,          :
                                 :
     Plaintiff,                  :
                                 :
     v.                          :   CASE NO. 3:13CV25(DFM)
                                 :
CAROLYN W. COLVIN, Commissioner  :
of Social Security,             :
                                 :
     Defendant.                  :
```

RECOMMENDED RULING ON PENDING MOTIONS

The plaintiff, Kathryn Ferris Stergue, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income. Pending before the court are the plaintiff's Motion to Reverse the Decision of the Commissioner (doc. #20) and the defendant's Motion to Affirm the Decision of the Commissioner (doc. #21). For the reasons that follow, the court recommends that the plaintiff's motion be denied and the defendant's motion granted.

I.   Eligibility for Benefits

Under the Social Security Act, an individual who is under a disability is entitled to benefits.  42 U.S.C. §§ 423(a)(1), 1381a.  Title II of the Social Security Act provides for the payment of disability insurance benefits "to individuals who have contributed to the program" and are disabled.  Hon. Thomas

P. Smith & Patrick M. Fahey, Some Points on Litigating Title II and Title XVI Social Security Disability Claims in United States District Court, 14 Quinnipiac L. Rev. 243, 244-45 (Summer 1994). Title XVI of the Act provides for the payment of supplemental security income to indigent persons who are disabled.  Id.  Both titles define "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Social Security regulations set forth a five-step sequential evaluation for adjudicating claims for disability insurance benefits and supplemental security income:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe

impairment, he has the residual functional capacity[1] to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983); see also 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof at the fifth step.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

To be eligible to receive disability insurance benefits under Title II, a claimant must demonstrate onset of disability on or before his date last insured.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (citing Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989); 42 U.S.C. §§ 423(a)(1)(A), (c)(1)).  See also Social Security Ruling ("SSR") 83-20, 1983 WL 31249, at *1 ("A title II worker cannot be found disabled under the Act unless insured status is also met at a time when the evidence establishes the presence of a disabling condition(s).").  To qualify for supplemental security income under Title XVI, a claimant must be disabled at some point during pendency of application, from filing date through date of ALJ's decision.  See Pratt v. Astrue, No. 3:10CV413(CFD), 2011 WL 322823, at *3 (D. Conn. Jan. 28, 2011) (citing 20 C.F.R. §§ 416.335, 416.335).

---

[1]Residual functional capacity is defined as the most a claimant can do in a work setting despite his limitations.  20 C.F.R. § 404.1545(a)(1).

II.   Procedural History

     In July 2007, plaintiff applied for disability insurance
benefits alleging that she suffered from fibromyalgia, chronic
fatigue, back pain, depression, panic disorder and bilateral
occipital brain hemorrhage.  (R. 102.)[2]  Her application was
denied initially and on reconsideration.  (R. 56-57.)  In July
2009, an administrative law judge ("ALJ") held a hearing.  (R.
19-55.)  In August 2009, the ALJ determined in a written
decision that plaintiff was not disabled within the meaning of
the Social Security Act.  (R. 6-17.)  The decision became final
in November 2009.  (R. 1.)  Plaintiff appealed to this court.
See Stergue v. Social Security Admin., No. 3:10CV128(WWE)(HBF),
(D. Conn. filed Jan. 27, 2010).

     In May 2010, while the appeal was pending, plaintiff
applied again for disability insurance benefits and protectively
applied for supplemental security income.  (R. 1013-19.)  In
September 2010, these applications were denied at the initial
level.  (R. 902, 933.)

     In September 2011, U.S. Magistrate Judge Holly B.
Fitzsimmons recommended reversal of the ALJ's decision.
Recommended Ruling, Stergue v. Social Security Admin., No.
3:10CV128(WWE)(HBF), (D. Conn. Sept. 29, 2011), doc. #21.  (R.

---

     [2]The court cites pages within the administrative record as
"R. __."

934-49.)   District Judge Warren W. Eginton adopted the
recommendation and remanded the case.   Id. at docs. ## 22-24.

On remand, the Appeals Council directed the ALJ to
consolidate plaintiff's two applications for disability
insurance benefits and to consider whether to consolidate her
supplemental security application as well.  (R. 952.)   In June
2012, the ALJ received additional medical evidence and held a
hearing at which the plaintiff was represented by counsel and
testified.  (R. 864-900.)   In October 2012, in a written
decision on the three consolidated applications, the ALJ
determined that plaintiff was not disabled for Title II purpose
through her date last insured of December 31, 2011 or for Title
XVI purposes from June 2010 to the date of the decision.  (R.
845-61.)   Plaintiff brought this action in January 2013 seeking
review of the ALJ's decision.

III. Factual Background

Plaintiff was 40 years old when she first applied for
disability benefits in July 2007.  (R. 76.)   She earned an
associate's degree in dental hygiene and began working as a
dental hygienist in 1988.  Her peak annual earnings were in
2003, with steady drop-offs from 2004 to 2006.  (R. 81, 102,
871.)   Plaintiff testified that she had continued working for

over ten years after being diagnosed with fibromyalgia[3] but that her symptoms worsened after a May 2004 stroke, and she stopped working in June 2006.  (R. 878.)

A.  Medical History

2003 to 2007

The first relevant treatment record indicates that, in April 2003, plaintiff was considering elective gastric bypass surgery due to fatigue and increasing back, leg and neck pain, which she attributed to obesity.  She stated that she had begun working part-time because of her weight and intensification of her fibromyalgia.  In addition, she expressed feelings of anxiety, anger and loneliness.  (R. 465-66.)  In May 2003, she fell and landed on her tailbone, which aggravated her low back pain and her low mood.  (R. 261, 464.)

In May 2004, plaintiff received emergency treatment for a cerebral hemorrhage of unknown origin.  (R. 168-99.)  Subsequent tests in 2004 and 2005 were unremarkable, and plaintiff did not suffer any subsequent stroke.  (R. 192, 223.)  At the time,

---

[3]Fibromyalgia is a syndrome characterized by chronic, widespread soft tissue pain accompanied by weakness, fatigue and sleep disturbances.  The American College of Rheumatology has set forth diagnostic criteria as follows: pain in both sides, above and below the waist, as well as in the axial distribution (inter alia the lumbar spine), plus point tenderness in at least 11 of 18 specified sites.  About one in three fibromyalgia patients responds to antidepressant and muscle relaxer therapy. The symptoms of fibromyalgia often cause moderate to severe disability that but generally can be mitigated with treatment. Stedman's Medical Dictionary 725-26 (28th ed. 2006).

plaintiff's medications included Lexapro and Synthroid.[4]  (R. 171.)  In September 2004, plaintiff complained of fibromyalgia pain in her joints and shoulder that limited her to working seven or eight-hour days when she was trying to work ten-hour days.  (R. 430.)  In December 2004, based on an MRI, she was diagnosed with fraying in her right rotator cuff.  (R. 418, 422.)

In March 2005, plaintiff reported increased depression and that "everything hurts except [her] toes."  (R. 413.)  From August to December 2005, she felt better and said that her pain was slowly resolving.  (R. 398-404.)

In January 2006, plaintiff reported a lot of pain in her back, hands and legs.  (R. 399.)  In May 2006, she began treating with physiatrist Sylvia Knoploch, MD.  She stated that she had been diagnosed with fibromyalgia twelve years before and had not had effective relief from trigger point injections or acupuncture.  Her symptoms were under fair control until her stroke in 2004.  She continued to work as a dental hygienist eight to thirty hours per week but missed days due to diffuse aches, pains, fatigue, poor sleep and headaches.  With medication, including Oxycodone as needed, her pain was two out

---

[4]Lexapro (escitalopram oxalate) is a selective serotonin reuptake inhibitor used as an antidepressant.  Dorland's at 654. Synthroid is a hormone replacement therapy used to treat hypothyroidism.  Dorland's Illustrated Medical Dictionary 1046 (31st ed. 2007).

of ten.  Dr. Knoploch diagnosed probable fibromyalgia.  (R. 395-96.)  In September 2006, Dr. Knoploch concluded that plaintiff had achieved partial symptom control on her medication regimen. She had more than eleven of eighteen diffuse tender points but demonstrated a full active range of motion on all planes and negative straight leg raises bilaterally.[5]  (R. 385.)  In October 2006, plaintiff began seeing pain management specialist Gerald Weiss, MD.  He, like Dr. Knoploch, found multiple tender points consistent with fibromyalgia.  (R. 263, 385.)  In addition, in November 2006, an MRI of plaintiff's lumbar spine showed degenerative disc disease including a bulge and tear at the L5-S1 level with biforaminal stenosis and moderate central canal stenosis at L4-5 due to diffuse disc bulge and facet and ligamentous hypertrophy.[6]  (R 276.)

    In January 2007, plaintiff stated that physical therapy had provided a "significant decrease in pain levels."  She continued to take regular doses of OxyContin and Celebrex but decreased her use of OxyIR for breakthrough pain to once a day, rather

---

    [5]In a straight leg raise, the straightened leg is raised while the subject is supine.  Pain or muscle spasm in the posterior thigh indicates lumbar root or sciatic nerve irritation.  Stedman's Medical Dictionary 1770 (28th ed. 2006).

    [6]Spinal stenosis is a narrowing of the vertebral canal, nerve root canals, or vertebral foramina (apertures) of the lumbar spine.  Dorland's Illustrated Medical Dictionary 1576 (28th ed. 1994).

than twice.[7]  (R. 284.)  In February 2007, her physical therapist reported slow, steady gains.  She could sit for one hour with pain, stand for one hour, ambulate three blocks and climb two flights of stairs with pain.  (R. 290.)  In April 2007, plaintiff was rear-ended in a motor vehicle accident.  A lumbar MRI confirmed the degenerative changes seen before and showed additional degeneration at L3-4.  (R. 296, 301.)  In May 2007, plaintiff reinjured her lower back and left shoulder when trying to help her father right an overturned tractor.  (R. 304.)  An MRI of her cervical spine showed some minimal disc ridging but was otherwise normal.  (R. 523.)  In June 2007, a lumbar X ray showed minimal degenerative changes at L2-3 and L3-4, and an MRI of plaintiff's thoracic spine showed protrusions with some impingement.  (R. 524-25.)  In July 2007, an X ray showed minor joint degeneration in her left acromioclavicular joint.[8]  (R. 336.)  Dr. Weiss treated plaintiff until January 2008 with medication and ONDAMED therapy.[9]  With the exception of a short

---

[7]OxyContin (oxycodone) and OxyIR (oxycodone hypocholoride) are opioid analgesics derived from morphine.  Dorland's Illustrated Medical Dictionary 1377 (31st ed. 2007).  Celebrex is a nonsteroidal anti-inflammatory.  Id. at 317.

[8]The acromioclavicular joint is the highest part of the shoulder joint and is connected by six ligaments.  Mosby's Medical, Nursing & Allied Health Dictionary 24 (6th ed. 2002).

[9]ONDAMED, which stands for "medicine wave," is an electromagnetic stimulator device used in alternative medicine. It identifies a body's dominant resonant frequency at a

reprieve in January and February 2007 as the result of some physical therapy, plaintiff consistently reported pain with fatigue, depression and panic attacks. (R. 726-32.)

During this period, plaintiff also received mental health treatment.  In August 2006, she went to the emergency room with complaints of anxiety, and her mood "improved" upon administration of Ativan and Benadryl.  (R. 226.)  From August to December 2006, plaintiff treated with psychiatrist George Kelly, MD.  (R. 236.)  He tried various combinations of medications including Cymbalta, Klonopin, Trazadone, Xanax, Provigil, Clomipramine, Valium, Lexapro and Abilify.[10]  (R. 246, 346-51, 735-37.)  In June 2007, plaintiff was accepted into intensive outpatient behavioral therapy.  A licensed social

particular time and then pinpoints areas of congested or chronically depleted energy.  Focused stimulation in various magnetic frequencies and intensities is applied to those areas "to restore the body's regulatory functions by dissolving interference fields associated with inflammatory processes, scar tissue and chronic energy depletions."  Leonard A. Wisneski and Lucy Anderson, The Scientific Basis of Integrative Medicine 270-71 (2d ed. 2009).

[10]Cymbalta is used for relief of pain and major depressive disorder.  Dorland's Illustrated Medical Dictionary 580 (31st ed. 2007).  Klonopin is used to treat anxiety and panic attacks. Id. at 379, 1003.  Trazadone is used to treat major depressive disorder, and Abilify is an antipsychotic medication. Physician's Desk Reference 3446, 3459 (65th ed. 2011).  Provigil is a stimulant used to treat narcolepsy, sleep apnea and other sleep disorders.  Id. at 1189.  Clomipramine is an antidepressant used to treat obsessive-compulsive disorder, panic and severe, chronic pain.  Id. at 379.  Abilify is an antipsychotic.  Id. at 133.

worker diagnosed major depressive disorder and generalized anxiety and assessed a GAF score of 38.[11]  (R. 311-23.) Plaintiff was discharged from the program due to "absences caused by multiple medical problems" and was referred to a psychiatrist for medication management.  (R. 325.)  In September 2007, plaintiff refused to treat with that psychiatrist after he disagreed with her decision to apply for disability.  (R. 692.) In August 2007, a licensed clinical social worker diagnosed dysthymic disorder and obsessive compulsive disorder and assessed her prognosis as "fair."  (R. 479.)  In November 2007, a psychologist diagnosed major depression and panic disorder and assessed a GAF score of 35.  (R. 493.)

 2008 to 2012

In February 2008, plaintiff sought treatment for her physical complaints at a community health clinic and continued there through the date of her second disability hearing.  (R. 784-97, 1134-39, 1204-90.)  With some short reprieves, she consistently complained of back pain, diffuse pain, depression,

---

[11]"GAF" refers to the Global Assessment of Functioning Scale used to measure an individual's "overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") at 30 (4th ed. 1994).  A GAF score of 31 to 40 corresponds to a major impairment in several areas, such as work, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family and unable to work) or some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant).  Id. at 32.

panic attacks, fatigue and insomnia; she continued to take medication for hypothyroidism; and she had episodes of cellulitis and edema in her legs in 2006, 2007 and 2009.[12]  From 2008 to 2010, she received epidural steroid injections.  (R. 789-99, 1204-35.)  In March 2010, she underwent gastric bypass surgery and lost almost sixty pounds in the next three months. (R. 1187, 1232.)  In September 2011, she was diagnosed with sleep apnea and was treated with a BiPAP machine.  She complained that the BiPAP was making her sleep worse.  (R. 1242, 1265.)  In May and June 2011, plaintiff was diagnosed with cubital tunnel and medial epicondylitis in her left elbow and received two injections there.[13]  (R. 1238-40.)  Between April 2011 and January 2012, she received five epidural injections. She was counseled that it was dangerous to receive more than three or four in a twelve-month period.  (R. 1237-47.)  She returned for another epidural injection three months later and reported that she had obtained eighty percent relief for two months.  (R. 1252.)  An April 2012 lumbar MRI showed a small to

---

[12]Cellulitis is a diffuse, acute infection of the skin and subcutaneous tissues characterized by redness, pain and swelling.  Mosby's Medical, Nursing & Allied Health Dictionary 314 (6th ed. 2002).  Edema is accumulation of fluid in cells and intercellular tissues.  Stedman's Medical Dictionary 612 (28th ed. 2006).

[13]Epicondylitis is commonly known as "tennis elbow." Dorland's Illustrated Medical Dictionary 637 (31st ed. 2007).

moderate-sized L4-5 disk extrusion, L5-S1 disk protrusion and mild stenosis L3-4 and 4-5.  (R. 1255.)  The last note of physical treatment is from August 2012 when supervising physician Dino Messina, MD personally examined plaintiff for the first time.  He listed her current medications as methadone, gapapentin, Synthroid, Savella, Lexapro, Abilify and epidural injections "as needed."[14]  He noted no motor or neurologic deficits on exam and noted complaints of pain in several locations and left sided sciatica, although "her MRI actually demonstrates right sided pathology in the L5/S1 distribution." He decided to wean plaintiff from methadone in favor of a Duragesic patch[15] and concluded: "We will aim for total cessation of pain meds and work on non-narcotic forms of therapy that include PT and weight loss."  (R. 1289-90.)

Except for a six-month gap at the beginning of 2009, plaintiff also received regular psychiatric treatment, including medication and individual therapy, until the date of the second hearing.  Her GAF scores during this period ranged from 54 to

---

[14]Methadone can be used as an analgesic for chronic pain. The Merck Manual of Diagnosis and Therapy 1773 (18th ed. 2006). Gabapentin (Neurontin) is used to help control seizures and also may be used to treat nerve pain conditions.  Physicians' Desk Reference 2590 (59th ed. 2005).  Savella (milnacipran) is a serotonin and norepinephrine reuptake inhibitor used for pain management of fibromyalgia.  Claudine M. Chwieduk and Paul L. McCormack, Milnacipran: in Fibromyalgia, 70 Drugs 99 (2010).

[15]Duragesic is an opioid analgesic patch.  Dorland's Illustrated Medical Dictionary 580 (31st ed. 2007).

60.[16]  (R. 1161-90.)  Her therapist, Carl Heinemeyer, LCSW, noted that she was motivated and compliant with treatment but preoccupied with physical ailments.  (R. 1170.)  Her diagnoses were major depressive disorder, panic disorder, sleep disorder and personality disorder NOS.[17]  (R. 1162.)  After her gastric bypass surgery in March 2010, her depression was in remission for three months.  (R. 1186-88.)  When her depression and anxiety became "rough" again in August 2010, plaintiff was unwilling to increase her dosage of Lexapro but did agree to increase her Abilify dosage.  (R. 1186.)  In November 2010, she recounted that her father, who had recently undergone open heart surgery, was dependent on her for medications, shaving, bills and that she managed his builder business.  She spent "a lot" of time reading Spanish at home and at church services, and read the Bible in congregation.  (R. 1185.)  In 2011 and 2012, plaintiff formed two dating relationships and found a roommate. In June 2011, she was going to the gym five days a week.  (R. 1183.)  In July 2011, she was taking care of her father, cooking

_____

[16]A GAF score of 51 to 60 corresponds to moderate symptoms (e.g., flat affect and circumstantial speech) or moderate difficulty in social or occupational functions (e.g., few friends or conflicts with coworkers).  DSM-IV at 32.

[17]Personality disorder NOS ("not otherwise specified") is a disorder of personality functioning that does not meet the criteria for any specific personality disorder such as obsessive-compulsive or paranoid personality disorders.  DSM-IV at 673.

his food and administering his medication.  (R. 1182.)  In
January 2012, she reported that she and her roommate ran a dog-
sitting business.  Plaintiff walked the dogs.  She was unable to
attend her "healthy lifestyles" support group due to her work
schedule.  (R. 1160.)  In May 2012, she experienced "a few"
panic attacks per week with poor sleep and low motivation.  She
stated that the dog hosting business was "going well" but that
her fibromyalgia pain had "interfered with her ability to work
well."  The psychiatrist prescribed Ativan.  (R. 1161.)

    B.  Opinion Evidence

    The record includes several opinion statements.  In
September 2007, Maggie Dunford, LCSW recalled treating plaintiff
for three weeks in an outpatient program in June 2007.  She
described plaintiff as depressed and anxious, concerned about
health problems and having an obvious problem handling
frustration.  (R. 365-67.)

    In January 2008, H. Samai, MD performed a consultative
examination and found plaintiff to be very obese with a powerful
grip, slightly diminished dexterity in her left hand, limited
left shoulder adduction limited and moderate pain in her left
hip and lower back with no tenderness and normal range of
motion.  His impression was generalized ache and pain, with
protruded disks in the lower back and upper back with some
clinical depression.  (R. 529-32.)

Also in January 2008, agency consultants reviewed the medical record.  A consultant named "S. Green" opined that that medical evidence "mostly supports her allegations but they are out of proportion to the objective evidence."  The consultant concluded that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand for at least two hours per workday and sit for a total of about six hours per workday.  (R. 535-41.)  Consultant Robert Decarli, PsyD described plaintiff as periodically distracted by pain that was improved by medication and capable of independent activities of daily living.  He opined that plaintiff was moderately limited in carrying out detailed instructions, maintaining extended concentration, working a normal week without psychological interruptions and found her capable of simple work for two-hour periods in an eight-hour day in an environment that did not require adherence to strict time or production quotas.  (R. 543-59.)  In May 2008, consultant Timothy Schumacher, PhD reiterated this opinion and added that plaintiff had no episodes of decompensation.  (R. 600-14.)

In April 2009, William Delaney, MD, one of the doctors who treated plaintiff at the community health clinic, completed a questionnaire regarding plaintiff's physical functional capacity.  He noted that his opinion was based on one visit and a review of prior records.  Dr. Delaney declined to attempt an

independent diagnosis regarding fibromyalgia.  He stated that
plaintiff's pain constantly interfered with the attention and
concentration needed to perform even simple work tasks.  She
could walk two blocks, sit for twenty minutes and stand for five
minutes.  In an eight-hour workday, she could sit less than two
hours and stand around two hours.  She would need to take a
five-minute walk every twenty minutes and needed to elevate her
legs 80 to 90 percent of workday.  She could rarely lift or
carry less than 10 pounds, and never more.  Dr. Delaney opined
that plaintiff was not malingering, that "[d]epression increases
[her] perception of pain," and that physical activity
exacerbated her pain such that she would require medication or
bed rest.  Her medications would have a "non-serious" effect on
her ability to work.  (R. 774-82.)

In April 2009, Carl Heinemeyer, LCSW completed a mental
impairment questionnaire co-signed by treating psychiatrist
Edward Lulo, MD.  Lulo had been treating plaintiff for nine
months and Heinemeyer had been seeing plaintiff at least twice a
month for five months.  Heinemeyer noted her depression, anxiety
and obsessive-compulsive behaviors and stated, "[h]er anxiety
around pain increases her experience of it" and opined that she
was not malingering.  He found moderate limitations in
activities of daily living, moderate social difficulties and
marked difficulties in maintaining concentration.  He indicated

17

that plaintiff had experienced three or more episodes of decompensation within twelve months, each lasting at least two weeks.  Heinemeyer estimated that she would miss more than four days of work per month for psychological reasons and found her prognosis to be "guarded due to physical conditions."  (R. 834-88.)

In September 2010, Antonico Joseph, MD performed a consultative examination.  He found plaintiff's history and exam consistent with lumbosacral radiculopathy with signs of neurological impingement manifested by decreased tendon reflexes and decreased sensation to left leg and foot.[18]  There was no change in muscle tone or strength.  He diagnosed fibromyalgia as evidenced by trigger points that was further aggravated by sleep apnea and insomnia.  Dr. Antonico found no residual deficits from the 2004 stroke.  (R. 1284-85.)

In July 2012, Carl Heinemeyer, LCSW submitted a second opinion.  He first began treating plaintiff in December 2008 and saw her two to three times per month since then.[19]  He assessed her current GAF as 56, with 57 being her highest score in the past year.  Heinemeyer found that she had significant

_____

[18]Radiculopathy is a disease involving the spinal nerve roots, Mosby's Medical, Nursing & Allied Health Dictionary 1459 (6th ed. 2002), as opposed to the spinal cord itself, Dorland's Illustrated Medical Dictionary 1239 (31st ed. 2007).

[19]The last treatment record signed by Heinemeyer is dated December 29, 2011.  (R. 1162.)

18

limitations in understanding, remembering and carrying out detailed instructions, in maintaining attention and concentration for extended periods and in completing a normal workday without interruptions.  He wrote that her behavioral condition "contributes to her experience of pain."  She was likely to be off-task 10 percent of the time, was likely to be absent four days per month and to leave work early on four additional days per month.  (R. 1157-59.)

C.  Plaintiff's Statements

Plaintiff's Activities of Daily Living questionnaires — completed in August 2007, April 2008 and June 2010 — indicate that she continued to care for herself and to maintain a social life with family, a few friends and religious services despite her impairments.  She shopped for groceries, cooked for herself, cleaned the house and did the laundry, although it took a long time and required much effort.  She often spent her days lying down due to pain and fatigue.  Her yard work was limited to pulling a few weeds.  Plaintiff cared for a dog, cat and ferret. She attended two religious services per week when able.  Her concentration was greatly diminished.  She continued to visit the homes of her mother and father and to talk to friends on the

phone.  She drove a car but twice had accidents when she fell asleep at the wheel.[20]  (R. 124-30, 145-52, 1074-81.)

At her second hearing in 2012, plaintiff sat with her legs elevated.  She testified as follows.  Her fibromyalgia was under control until her stroke in May 2004.  When working, her legs would become numb, with pain shooting up her back and down her legs, preventing her from sitting.  Her boss was very accommodating, allowing her to work a lighter schedule, but she often could not complete the standard ten-hour days and eventually quit.  If she tried to hold a dental instrument at present, her elbow numbness and lack of fine manipulation in her left hand would cause her to drop it.  Her shoulder, arm and elbow pain limited her ability to lift objects such that she used both hands to lift gallon of milk.  Plaintiff had pain and numbness in both legs, especially her left.  She experienced fibromyalgia pain every day, all day, especially during changes in the weather.  It felt like having flu minus the fever with lethargy, ache, pain all over and foggy thinking.  The pain was constant and tended to migrate.  Touching pressure points caused excruciating pain.  Plaintiff took Savella, Lexapro and gabapentin.  She always felt tired and run down and could not

---

[20]On the April 2008 questionnaire, plaintiff added a postscript proclaiming that she was not malingering and pleading not to have to complete another such questionnaire, which assertedly took her five hours due to difficulty concentrating. (R. 151-52.)

maintain concentration.  To be able to testify, she drank coffee
and a 5-Hour Energy drink and "focus[ed] very, very hard".  Her
sleep apnea had improved after adjustments to her BiPAP therapy.
Six hours was a good night of sleep for her, and she napped
every day, sometimes for two hours.  Her sleep was "screwed up"
for so many years she could not estimate the amount of sleep
that might be ideal for her.  Plaintiff testified that her
anxiety diminished substantially after 2007 such that it no
longer would prevent working.  She also testified that, under
pressure from her father, who paid her rent and believed that
she was not ill, plaintiff made three aborted efforts to return
to work.  Each time she had panic attacks that manifested in
sweating, heart palpitations and the need to step away and
regroup.  After each attempted return to work, she spent several
days recovering in bed.

    Plaintiff testified that she spent much of each day lying
down with her legs elevated to prevent cellulitis and ease back
pain.  Laundry was a two-day project.  She could not vacuum but
she mopped and cleaned counters.  Her roommate did the rest.
Plaintiff attended church services some Sundays for a half hour
to forty-five minutes and then left early.  She could function
despite her depression as long as she did not have to go out.
At least once a week, she felt as if she was in a "black cave of
doom" in which she did not want to see anyone or do anything.

That feeling typically lasted for a day but recently had lasted for two weeks.  After that episode, her Abilify dosage was increased.  In addition to her "black cave" days, plaintiff had "down spells" ten to fifteen times per month lasting all day. She counted compulsively, especially teeth, was averse to odd numbers and was obsessed with organization and symmetry. Plaintiff saw a therapist twice a month and reviewed her medications with a psychiatrist once a month.  (R. 869-98.)

IV.  ALJ's decision

In October 2012, the ALJ found at step one that plaintiff had no substantial gainful employment since her alleged onset date of December 31, 2006.  At step two, he found that plaintiff had the following severe impairments: degenerative disc disease, fibromyalgia, history of subarachnoid hemorrhage, right shoulder impingement, left shoulder acromioclavicular joint dysfunction, obesity, status post gastric bypass surgery, episodes of cellulitis and lower extremity edema, sleep apnea, depression, panic disorder, obsessive compulsive disorder and personality disorder not otherwise specified.  (R. 848.)  He found at step three that plaintiff did not have a listed impairment.  (R. 849-50.)  The ALJ then found that plaintiff's medically determinable impairments reasonably could be expected to cause the alleged symptoms but found that her statements concerning the intensity, persistence and limiting effects of her symptoms were not

22

entirely credible.  He determined that the plaintiff retained

the residual functional capacity "to perform sedentary work . .

. except she can only frequently use her upper extremities for

reaching [and] is limited to simple instructions and can perform

routine, repetitive tasks."[21]  (R. 850-59.)  At step four he

determined that plaintiff was unable to perform her prior

relevant work as a dental hygienist but found at step five that

other jobs existed in significant numbers in the national

economy that she could perform.  (R. 14-16.)  As a result, the

ALJ ruled that the plaintiff was not disabled within the meaning

of the Social Security Act from her alleged date of onset to the

date of the decision.  (R. 860.)

V.    Standard of Review

     "A district court may set aside the Commissioner's

determination that a claimant is not disabled only if the

factual findings are not supported by substantial evidence or if

the decision is based on legal error."  Burgess v. Astrue, 537

F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted).

Substantial evidence is "more than a mere scintilla.  It means

such relevant evidence as a reasonable mind might accept as

---

[21]It is not apparent why the ALJ characterized "frequent"
reaching as a limitation.  In the context of the Medical
Vocational Guidelines, "frequent" is defined as occurring from
one-third to two-thirds of the time, whereas "occasional" is
defined as occurring from very little up to one-third of the
time.  SSR 83-10.

adequate to support a conclusion."  Id.  The court "is not to decide the facts anew, nor to reweigh the facts, nor to substitute its judgment for the judgment of the ALJ.  Rather, the decision of the ALJ must be affirmed if it is based upon substantial evidence even if the evidence would also support a decision for the plaintiff."  Bellamy v. Apfel, 110 F. Supp. 2d 81, 86 (D. Conn. 2000).

VI.  Discussion

A.  Credibility Analysis

Plaintiff first contends that the ALJ failed to comply with Social Security Ruling ("SSR") 12-2p, which explains the process for evaluating fibromyalgia in disability claims.  The thrust of plaintiff's argument, however, is that the ALJ had an insufficient basis for finding that plaintiff was not entirely credible when describing the intensity, persistence or limiting effect of her fibromyalgia symptoms.  In other words, plaintiff's argument pertains to SSR 96-7p, not SSR 12-2p.

When assessing the credibility of a claimant's subjective complaints, an ALJ must follow a two-step inquiry.

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.

24

Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529; SSR 96-7p)).  "[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  SSR 96-7p.  The regulations list seven factors for the ALJ to consider in making this determination, including (1) daily activities; (2) location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) medications and their efficacy; (5) treatment other than medication; (6) other measures taken for relief; and (7) other relevant factors.  20 C.F.R. §§ 404.1529, 416.929.

In this case, the ALJ found that plaintiff's medically determinable impairments reasonably could be expected to cause the alleged symptoms.  However, he found that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.  (R. 851.)  He focused especially on inconsistencies between plaintiff's testimony regarding her activities and her reports to treating sources.  (R. 858-59.)  He also found that physical therapy, epidural injections, medications, gastric bypass surgery and BiPAP

provided significant improvement. (R. 853-55.) The ALJ
concluded that "the record as a whole . . . reflects
insufficient evidence of functional limitations that would
preclude the claimant from being able to work based on the
objective findings, adequate relief with treatment, and the
claimant's daily activities." (R. 859.)

Plaintiff argues that the ALJ cherry-picked evidence and
distorted its meaning. The ALJ cited the "slow, steady gains"
recorded in her physical therapy notes; plaintiff argues that
her baseline functioning was still quite low. The ALJ cited her
report of decreased pain and improved ability to function;
plaintiff argues that she subsequently relapsed. The ALJ cited
her three aborted attempts to return to work as a dental
hygienist; plaintiff argues that this demonstrates inability to
work. The ALJ noted that plaintiff's conditions were described
as "stable"; she argues that "stable" does not mean
"functional." The ALJ cited her favorable response to epidural
injections; plaintiff argues that the relief was only temporary.
The ALJ cited plaintiff's own statements to mental health
treaters that she provided total care for her father after his
open heart surgery, including managing his builder business;
plaintiff argues that the ALJ "ambushed" her by not
investigating this further at the hearing. The ALJ cited
plaintiff's report to mental health treaters that she started a

dog-walking business with her roommate; plaintiff notes her
subsequent report that her fibromyalgia "interfered" with this
work.  Plaintiff summarizes her arguments as follows: "For
reasons that appear nowhere in the Record, [plaintiff's] claims
of pain appear to have been discounted to insignificance or
trivialized by the ALJ."  (Pl.'s Br. at 33.)

Contrary to plaintiff's characterization, the ALJ did not
take evidence out of context.  For example, the ALJ did not
merely note that doctors described her condition as "stable" but
stated more precisely that her "conditions have been stable at a
level that would allow her to perform work."  As for the effect
of the epidural injections, the ALJ carefully noted that
"complete resolution of her symptoms was not achieved," which is
reflected in his impairment finding and his residual functional
capacity assessment.  It is evident in the ALJ's thorough and
conscientious decision that he had a firm grasp on the mammoth
1290-page record.  He could not have cited every piece of
evidence, nor was he required to.  See Brault v. Social Sec.
Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (ALJ not
"required to discuss every piece of evidence submitted"); Zabala
v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (ALJ not required to
"reconcile explicitly every conflicting shred of medical
testimony").

In addition, substantial evidence supports the ALJ's
conclusion that plaintiff made inconsistent statements about her
own capabilities.  For example, as the ALJ noted, plaintiff
stated that that she tried to return to work on three occasions,
under pressure from her father, and felt so overwhelmed during
her most recent attempt that she had to stay in bed for three
days to recover.  She also testified at the hearing in June 2012
that she spent all day lying down, could not concentrate,
required two days to complete her weekly laundry and needed two
hands to lift a gallon of milk.  However, plaintiff told her
therapist in November 2010 that her father was dependent on her
for medications, shaving, bills and managing his builder
business and, in July 2011, mentioned that she was taking care
of her father, cooking his food and administering his
medication.  She also told her therapist in January and May 2012
that she operated a dog-sitting business with her roommate but
was not forthcoming about this activity in her June 2012
testimony.  The ALJ did not err in concluding that these
inconsistencies weighed against plaintiff's credibility.
Although the plaintiff argues that there is evidence that would
support her claim, the court's role "is not to decide the facts
anew, nor to reweigh the facts, nor to substitute its judgment
for the judgment of the ALJ.  Rather, the decision of the ALJ
must be affirmed if it is based upon substantial evidence even

if the evidence would also support a decision for the plaintiff." Bellamy v. Apfel, 110 F. Supp. 2d 81, 86 (D. Conn. 2000).

B.  Evaluation of Mental Impairments

Plaintiff next challenges that the ALJ's assessment of her mental impairments.  She argues that he ignored that her depression, although temporarily in remission in July 2010, had relapsed a few months later.  She also argues that he placed too much emphasis on her GAF scores.

Plaintiff does not explain how the alleged errors might have invalidated the ALJ's conclusions at any step in the sequential analysis.  Regardless, the ALJ did not commit the alleged errors.  The ALJ found that the plaintiff suffered from severe impairments including depression, panic disorder, obsessive compulsive disorder and personality disorder not otherwise specified.  In addition, the ALJ's residual functional capacity assessment limited plaintiff to simple instructions and routine, repetitive tasks.  It is evident that the ALJ understood that depression was still a factor in plaintiff's life.  As for plaintiff's GAF scores, they were only a minor feature of the ALJ's two-page discussion of plaintiff's mental health treatment.  The ALJ did not rely on them to the exclusion of other evidence.

C.  Treating Physician Rule

Next, plaintiff contends that the ALJ did not comply with
the treating physician rule.  Under the treating physician rule,
"the opinion of a claimant's treating physician as to the nature
and severity of the impairment is given 'controlling weight' so
long as it 'is well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent
with the other substantial evidence in [the] case record.'"
Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20
C.F.R. § 404.1527(c)(2)); see also 20 C.F.R. § 416.927(c)(2).
"When other substantial evidence in the record conflicts with
the treating physician's opinion, however, that opinion will not
be deemed controlling.  And the less consistent that opinion is
with the record as a whole, the less weight it will be given."
Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  "[W]hen a
treating physician's opinion is not given 'controlling' weight,
the regulations require the ALJ to consider several factors in
determining how much weight it should receive."  Burgess, 537
F.3d at 129.  These factors include the frequency of
examination; the length, nature and extent of the treatment; the
degree to which the physician cited supporting medical evidence;
the consistency of the opinion with the record as a whole;
whether the physician is a specialist in that area; and other

30

factors that tend to support or contradict the opinion.  See 20
C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ assigned "limited" weight to the 2009 opinion of
treating physician Dr. Delaney.  As grounds for this conclusion,
he cited Dr. Delaney's treatment notes, plaintiff's progress in
physical therapy, Dr. Delaney's own examination, the efficacy of
epidural treatments, the "mild" spinal degeneration shown on an
MRI and Dr. Delaney's reliance on plaintiff's subjective
complaints, which the ALJ found to be not entirely credible.
(R. 853-54, 857.)  In addition, the ALJ assigned "little" weight
to the 2009 and 2012 opinions of licensed clinical social worker
Carl Heinemeyer and psychiatrist Dr. Lulo.  (R. 858.)  He cited
evidence from the treatment notes, including peaks and valleys
in plaintiff's mood with frequent reports of wellness and a
period of significant improvement in 2010.  He also discussed
plaintiff's reports of a social life and extensive activities of
daily living, including reports of work.  Finally, the ALJ
assigned "considerable" weight to the opinions of non-examining
agency consultants based on his finding that they were generally
consistent with the longitudinal treatment record.  (R. 857.)

Plaintiff makes two cursory allegations of error in the
ALJ's assessment of the medical opinions.  First, she contends
that the treatment record "established the plaintiff's
disability virtually prima facie," yet the ALJ assigned "little

weight" to the treating sources.  The ALJ's discussion of the
medical evidence amply disproves this contention.  Second,
plaintiff contends that the ALJ assigned "considerable weight"
to the opinions of non-examining agency consultants without
"point[ing] to evidence that the opinions of these State agency
document reviewers are ostensibly consistent with."  To the
contrary, leading up to the section in which he addressed the
consultants' opinions, the ALJ engaged in a six-page discussion
of plaintiff's treatment records.  In short, plaintiff has not
identified reversible error in the ALJ's evaluation of the
medical opinions.

   D.  Combination of Impairments

   Plaintiff next argues that the ALJ improperly ignored her
obesity and failed to consider the combined impact of her severe
impairments.  The ALJ did not ignore plaintiff's obesity.  He
noted that she had undergone gastric bypass surgery with no
complications and lost nearly a third of her weight as a result.
Plaintiff has not pointed to any evidence disproving this
statement or showing that obesity worsened her other impairments
or restricted her ability to work.  Likewise, plaintiff has not
identified evidence of some interplay or combination of
impairments that the ALJ ignored.  The ALJ gave attention to
each of her impairments, expressly stated that he considered
them in combination and pointed to evidence that plaintiff was

able to function despite her impairments.  This analysis was adequate.  See, e.g., DeJesus v. Astrue, No. 3:10CV705 (CFD) (TPS), 2011 WL 2076447, at *3 (D. Conn. May 26, 2011) (viewing analyses at steps three and four as a whole, ALJ adequately addressed combination of impairments where he explicitly stated that he considered impairments in combination and then proceeded to examine the medical records).

E.  Vocational Expert

Finally, plaintiff argues that the ALJ was required to consult a vocational expert at step five because she has nonexertional impairments.  "The Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix II, Rules 200-204, are a shorthand way of evaluating vocational factors that take into consideration a claimant's age, education, and previous work experience."  Bethea v. Astrue, No. 3:10 CV 744(JCH), 2011 WL 977062, at *13 (D. Conn. Mar. 17, 2011).  The Second Circuit has instructed that vocational expert testimony, instead of the Medical Vocational Guidelines, is required where the nonexertional limitations "significantly limit the range of work permitted by [the claimant's] exertional limitations."  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986) (internal quotation marks omitted)).

> However, the "mere existence of a nonexertional
> impairment does not automatically . . . preclude
> reliance on the guidelines." . . .  A nonexertional
> impairment "significantly limit[s]" a claimant's range
> of work when it causes an "additional loss of work
> capacity beyond a negligible one or, in other words,
> one that so narrows a claimant's possible range of
> work as to deprive him of a meaningful employment
> opportunity."

Id. at 410-11 (quoting Bapp).

     Here, the ALJ found that plaintiff can perform sedentary

work "except she can only frequently use her upper extremities

for reaching [and] is limited to simple instructions and can

perform routine, repetitive tasks."  (R. 850.)  At step five, he

stated that these "additional limitations have little or no

effect on the occupational base of unskilled sedentary work" and

therefore relied on the Medical Vocational Guidelines without

calling a vocational expert.  (R. 860.)  The ALJ did not err in

finding that plaintiff's capacity to reach "frequently" did not

significantly limit the range of sedentary work.  Cf. SSR 85-15

("Significant limitations of reaching or handling . . . may

eliminate a large number of occupations a person could otherwise

do"); Selian v. Astrue, 708 F.3d 409, 422 (2d Cir. 2013)

(remanding where ALJ did not expressly determine whether

claimant's limitation to "occasional" reaching was negligible).

Likewise, the ALJ did not err in finding plaintiff's ability to

carry out only simple instructions and routine, repetitive tasks

did not erode the occupational base of unskilled work.  See SSR

85-15 (basic mental demands of unskilled work include abilities to understand, carry out, and remember simple instructions and to deal with changes in a routine work setting).  See also, e.g., Zabala, 595 F.3d at 411 (limitation to carrying out simple instructions did not preclude use of Medical Vocational Guidelines); Colon-Torres v. Colvin, No. 6:12CV1591(GLS), 2014 WL 296845, at *4 (N.D.N.Y. Jan. 27, 2014) (vocational expert testimony not required where claimant could perform "routine daily tasks and duties which are not fast-paced and which do not significantly change in pace or location on a daily basis"); Howe v. Colvin, No. 1:12CV6955(JPO)(SN), 2013 WL 4534940, at *18 (S.D.N.Y. Aug. 27, 2013) (limitation to simple, routine, and repetitive tasks in a low stress environment had little or no effect on the occupational base of unskilled sedentary work).

VII. Conclusion

For the foregoing reasons, the court recommends that the plaintiff's motion (doc. #20) be DENIED and the Commissioner's motion (doc. #21) be GRANTED.

Any party may seek the district court's review of this recommendation.  See 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within fourteen days after service of same); Fed. R. Civ. P. 6(a), 6(d) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of

Connecticut; <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992).  Failure to timely object to a magistrate judge's report will preclude appellate review.  <u>Small v. Sec'y of Health and Human Serv.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

        SO ORDERED at Hartford, Connecticut this 30th day of May, 2014.

                            _____/s/_____
                            Donna F. Martinez
                            United States Magistrate Judge